

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-31-2000

# Lettrich v. JCPenny

Precedential or Non-Precedential:

Docket 99-3034

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Lettrich v. JCPenny" (2000). *2000 Decisions.* Paper 113.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/113

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 31, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3034

JOSEPH LETTRICH,
and all others similarly situated,
        Appellant

v.

J. C. PENNEY COMPANY, INC.

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 98-cv-00137)
District Judge: Hon. Donald J. Lee

Argued: October 18, 1999

Before: SLOVITER, MANSMANN, and ROTH,
Circuit Judges

(Filed: May 31, 2000)

        Daniel W. Ernsberger (Argued)
        Behrend & Ernsberger
        Pittsburgh, PA 15219

         Attorney for Appellant

          John B. Rizo, Sr. (Argued)
          J. C. Penney Company, Inc.
          Legal Department
          Plano, TX 75024

           Attorney for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

At issue on this appeal is the requirement under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. SS 1001-1461, that an employer notify participants of a material change in a welfare plan. Plaintiff Joseph Lettrich contends that he left his position as a pharmacist with J.C. Penney Company, Inc. in 1997 under the belief that he was entitled to the severance benefits established in 1988 by J.C. Penney for qualified employees. J.C. Penney denied his request for benefits on the ground that the company had rescinded the separation pay program in 1993. Lettrich sued J.C. Penney under ERISA claiming that the cancellation was void for lack of effective notice of that material change in the program. He also contends that he is entitled to the benefits under an equitable estoppel theory. The District Court granted summary judgment in favor of J.C. Penney. Lettrichfiled a timely appeal.

I.

A.

The following facts are not in dispute. In 1988, J.C. Penney adopted a Separation Allowance Program (herein the "separation pay program" or the "program") for its profit-sharing employees in an effort to alleviate growing employee concerns over job security and the possibility of lost welfare benefits. These employee concerns emanated from the company's announced relocation of its home office from New York to Texas and from the vigorous acquisition

activity that was occurring at that time in the retail merchandise industry. The program addressed these concerns by providing a lump-sum severance payment if an eligible employee was terminated within two years of a change of control. "Change of control" was defined to include a merger or consolidation. The size of the severance payment was to be based on the employee's length of service. The program also provided that the medical and dental coverage, term life insurance, stock options and a relocation allowance would be extended.

The program specified that it would continue for a term of five years, and would automatically renew for another five-year term unless the Board of Directors canceled the program sixty days before the termination date.

After J.C. Penney established the separation pay program, the company circulated news of this program to eligible employees along with a descriptive brochure that included the following:

> The Separation Allowance Program provides for both separation pay and benefits if you lose your job within a certain period after a change of control of the Company. It is designed for your peace of mind. It is a tangible form of reassurance of JCPenney's commitment to you.
>
> Take some time to understand what the program offers and share it with your family. Then, file it away with your other important papers. This program should remove any distracting concerns you may have about the future. And with this protection in place -- you can move forward and continue making the most of the present.

App. at 30.

Employees were notified that the Board of Directors could abolish the separation pay program in five years but that if no steps were taken to do so, the program would renew automatically for another five-year term. J.C. Penney requested all company managers to hold special meetings to communicate the new separation pay program personally to all eligible employees in their unit. For that purpose, the

3

company provided a video message discussing the reasons for the new program, copies of the descriptive brochure, a scripted discussion guide, and a list of potential questions and answers.

Five years later, on November 11, 1992, the J.C. Penney Board of Directors terminated the separation pay program. The company's notification to participants of this change in benefits came by way of inclusion in its 1993 notice of shareholders meeting and proxy statement (hereafter "Notice of Meeting") of a section titled Separation Allowance Program. This notification was placed in the middle (after page 30) of the sixty-two page Notice of Meeting. It read as follows:

> Separation Allowance Program. In March, 1988, the Board of Directors adopted a Separation Allowance Program ("Separation Program") for profit-sharing management associates, including executive officers; adopted a Pension Plan amendment designed to protect the surplus assets in that plan for all employees ("Plan Amendment"); and, in 1989, 1990, and 1991, granted contingent stock options to participants in the Company's Equity Plan ("Contingent Stock Options"), which would become exercisable in the event of a "change of control" regarding the Company and an option holder's employment termination within two years thereafter. These actions were taken to address employee concerns regarding job and benefits security in light of the Company's announced relocation of its Home Office from New York to Texas, and in light of the active acquisition activity which was occurring at that time in the retail merchandise industry. The Separation Program was effective for five years and provided for automatic renewal for subsequent five-year periods, unless terminated by the Board.

> Due to the changed circumstances that have occurred since the 1988 implementation of these three programs, including the completion of the Company's successful relocation, the Board determined in November, 1992, that: (1) the Separation Program not be renewed for an additional five-year period; (2) the Plan Amendment be retained; and (3) the Company

4

> request holders of Contingent Stock Options to
> surrender them in exchange for, on a pre-split basis,
> one normal stock option for each ten Contingent Stock
> Options so surrendered (See "Option/SAR Grants in
> Last Fiscal Year" table on page 22.)
>
> As a result of these actions by the Board of Directors,
> the Separation Program terminated on March 14, 1993.
> . . .

App. at 77.

The page facing this notification contained the announcement of a new 1993 Equity Plan that would replace the separation pay program. The Equity Plan required shareholder approval to become effective. Unlike the separation pay program which had applied to a large group of "profit sharing associates," store managers, assistant managers and certain eligible associates, the Equity Plan was to apply to no more than 2,000 employees.

The Assistant Manager of Chemical Bank, the transfer agent for J.C. Penney, testified that the bank mailed a copy of the Notice of Meeting to each plan participant. All employees entitled to benefits under the separation pay program were shareholders. Lettrich does not contest that the Notice of Meeting was sent to all affected employees, including himself, and that it contained the information required by ERISA and the plan. Specifically, in the notice J.C. Penney stated that due to, inter alia, the completion of the Company's successful relocation, the Board determined in November 1992 not to renew the separation pay program and that "the Separation Program terminated on March 14, 1993." Id.

The notification included in the Notice of Meeting constituted the only notification to the employees/ participants of the termination of the separation pay program. Nothing on the cover of the Notice of Meeting called attention to the inclusion of the notification announcing the program's termination or to the page on which it was placed. J.C. Penney had previously distributed Benefit Information Flyers to all employees to notify them of changes in medical and dental benefits, but it did not use that procedure on this occasion. Nor did it send the

5

notification of the termination of the program to Robert
Perrin, the Vice President of Human Resources within Thrift
Drug, who had responsibility for promoting and
implementing the separation pay program. It happened that
Perrin, who maintained his own internal follow-up system,
inquired about the status of the program. In response, J.C.
Penney informed Perrin of the program's termination. There
is no allegation that J.C. Penney prohibited or in any way
discouraged Perrin from spreading word of the program's
termination. He testified at his deposition that he did not
do so on his own because he knew such notices require
legal approval and he expected J.C. Penney to send out
notice in an information flyer. When employees called
Perrin regarding the separation pay program, he informed
them that J.C. Penney had terminated that program.

B.

Lettrich was first employed by Thrift Drug as a
pharmacist in 1975. Thrift Drug was then a division of J.C.
Penney although it was subsequently spun-off as a
subsidiary. In 1996, J.C. Penney acquired Eckerd Drug Co.
and began integrating the pharmacist services offered by
Eckerd with those already provided by J.C. Penney through
its subsidiary, Thrift Drug. The Thrift Drug store where
Lettrich worked was closed and reopened under the name
Eckerd. On March 8, 1997, Lettrich was advised that he
could retain his job as an employee of Eckerd if he
relinquished his position as store manager and accepted a
cut in pay. Lettrich briefly accepted this offer only to resign
several months later. At that time, Lettrich, who regarded
the combination with Eckerd as a change of control,
requested the severance pay to which he believed he was
entitled under the separation pay program. J.C. Penney
denied his request on the ground that it had discontinued
that program four years earlier. Lettrich contends that he
was unaware of the termination of the program because
J.C. Penney concealed the notification in the Notice of
Meeting and failed to alert employees that the Notice of
Meeting contained important information regarding welfare
benefits.

6

Lettrich filed suit in the United States District Court for the Western District of Pennsylvania against J.C. Penney on behalf of himself and others similarly situated pursuant to S 502(a)(1)(B) of ERISA. See 29 U.S.C.S 1132(a)(1)(B). He contends that J.C. Penney's languid attempt to notify participants of the termination of the separation pay program failed to satisfy ERISA's notice and disclosure requirements set forth in 29 U.S.C. S 1024(b)(1)(B) and 24 C.F.R. 2520.104-1(b)(1). In his complaint, Lettrich claims that J.C. Penney actively concealed the program's termination from a majority of the program's participants by placing the notification in a shareholders' Notice of Meeting where few, if any, employees would notice it, failing to use the effective and customary internal procedure for notification of benefit changes, and providing actual notice of the program's termination to only a select group of officers.

The case was referred to a Magistrate Judge for pretrial proceedings. Thereafter, J.C. Penney moved for summary judgment. The Magistrate Judge accepted Lettrich's position that he resigned from J.C. Penney believing he would receive severance pay under the separation pay program. She further stated, "[i]t is not surprising that [Lettrich] was not aware of the termination of the separation allowance program since the notice of termination was `buried' in the notice of the annual meeting." Amended Report and Recommendation, Doc. # 23 (Nov. 24, 1998) at 10 (hereafter "Report and Recommendation").1 The court agreed with Lettrich that he did not receive the notification required by the regulation promulgated pursuant to ERISA. Nevertheless, relying on our decision in Ackerman v. Warnaco, Inc., 55 F.3d 117 (3d Cir. 1995), she recommended that J.C. Penney's motion for summary judgment be granted, stating: "defects in notice do not entitle an employee to receive the benefits unless the employee can show extraordinary circumstances such as bad faith by his employer or active concealment of a change

_____

1. The original Magistrate Judge's Report and Recommendation, dated October 15, 1998, was amended following Lettrich's objections to acknowledge that he was a participant covered under the plan, not merely a beneficiary.

in the benefits plan." Id. The Magistrate Judge concluded that Lettrich had provided no such evidence and recommended granting summary judgment for the

defendant. The District Court adopted the recommendation and granted J.C. Penney's motion for summary judgment. At the same time, the court denied Lettrich's motion to maintain the action as a class action as moot. Lettrich timely filed this appeal.

II.

We have jurisdiction over this appeal pursuant to 28 U.S.C. S 1291. We engage in plenary review of a District Court's grant of summary judgment and consider the facts in the light most favorable to Lettrich. See, e.g., Seitzinger v. Reading Hosp. & Med. Ctr., 165 F.3d 236, 238 (3d Cir. 1999). To prevail, J.C. Penney must show that there is no genuine issue as to any material fact and that J.C. Penney is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 247 (1986).

III.

ERISA recognizes two types of employee benefit plans, pension plans and welfare benefits plans, and has different requirements for each. Unlike the rules governing pension plans, see 29 U.S.C. SS 1051-1061, there is no automatic vesting requirement for welfare benefits. The parties agree that J.C. Penney's Separation Allowance Program was a welfare benefits plan. As the Supreme Court made clear, "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits," and employers are "generally free . . . , for any reason at any time, to adopt, modify, or terminate welfare plans." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995).

This does not mean that welfare benefits plans are not subject to any regulations at all. ERISA requires, inter alia, that any change or modification to a welfare plan must be in writing. See 29 U.S.C. S 1102(a)(1); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1162-64 (3d Cir. 1990)

(holding that failure to follow this procedural requirement negates the effectiveness of the attempted modification). In addition, ERISA requires that plan administrators furnish participants with a summary of any material modifications written in a manner calculated to be understood by the average participant. See 29 U.S.C. S 1022(a). ERISA also requires that a welfare benefits plan must include an amendment procedure. See 29 U.S.C. S 1102(b)(3). In Curtiss Wright, the Supreme Court held that the employer must follow the amendment procedure set out in the plan, and it remanded for a determination whether there was compliance with that amendment procedure. 514 U.S. at 85.

In Ackerman v. Warnaco, Inc., 55 F.3d 117 (3d Cir. 1995), decided a few months after the Supreme Court's decision in Curtiss-Wright, this court rejected the employer's contention that the amendment procedures of ERISA are inapplicable to the complete rescission of a benefit plan. We stated that "the requirements of section 402(b)(3) apply to plan terminations as well as plan amendments," reasoning that "it is anomalous to suggest that ERISA offers employees protection from mere changes in employee benefit plans, but does not afford protection against wholesale elimination of benefits." Id. at 121; see also Deibler v. United Food & Commercial Workers' Local Union 23, 973 F.2d 206, 210 (3d Cir. 1992).

The J.C. Penney plan required a vote by its Board of Directors sixty days prior to March 14, 1993 for the termination of the welfare plan to be effective. The vote taken November 11, 1992 satisfied this procedural requirement, and Lettrich does not contend otherwise. Nor does he contend that the notice failed to satisfy the ERISA requirement that any material modification be written in a manner calculated to be understood by the average participant. See 29 U.S.C. S 1022(a). Instead, the thrust of Lettrich's complaint is that J.C. Penney failed to give the plan participants the notice that was required.

Under ERISA's notice and disclosure requirements, the administrator of an employee benefit plan (here J.C. Penney) must furnish participants and beneficiaries with a readily understandable summary of any "material

9

modifications" in accordance with the notice and disclosure requirements contained in S 1024(b)(1). See 29 U.S.C. S 1022. The requirements set forth in S 1024(b)(1) call for "a summary description of such modification or change. . . [to] be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan." 29 U.S.C. S 1024(b)(1).

The notice requirements were further amplified by a regulation promulgated by the Secretary of Labor pursuant to authority provided by the statute. That regulation provides that a plan administrator must notify participants and beneficiaries of material reductions in covered services or benefits by using measures reasonably calculated to ensure actual receipt of the material by the plan participants. See 29 C.F.R. 2520.104b-1(b)(1). Lettrich's argument thus is that the placement of the notification of the termination of the separation pay program in the annual shareholders' Notice of Meeting was not reasonably calculated to ensure actual receipt of the notification of termination.

The Magistrate Judge did not disagree with Lettrich's complaint about the inadequacy of the notice. She recognized that "the notice of termination was`buried' in the notice of the annual meeting" and concluded that Lettrich "did not receive the notice required by 29 C.F.R. S 2520.104b-1(b)(1)." Report and Recommendation at 10. We agree that there is at least a factual issue concerning whether the notice requirement was met in this case. The issue of notice is not merely whether the document was mailed and received. We construe the regulation which focuses on the need to take measures reasonably calculated to ensure actual receipt of the material to contemplate that in some situations mailing may not be enough if it is not reasonably calculated to alert the recipients of the significance of the mailing. We do not decide whether that is the case here, but we believe a fact finder could conclude that a 2 or 3 paragraph notice of termination of a welfare benefit which, in the Magistrate Judge's words, was "buried" in the middle of a 61-page notice of a shareholders meeting with nothing in the exterior to call it to the

10

attention of the participants does not satisfy the requirement.

The Magistrate Judge recommended dismissal or summary judgment for J.C. Penney based on her interpretation of our opinion in Ackerman, and the District Court adopted the recommendation. The facts in Ackerman are somewhat comparable to those here. There, as here, the employer terminated a severance program. There, as here, the plaintiffs argued that they had not received adequate notice of the deletion of the termination allowance policy. Although notice of the termination of the program was included in the company's 1991 handbook, neither the handbook nor any other notice of the termination of the policy was distributed to the employees at the Altoona plant, nor were there any meetings held at the plant to advise the employees of the change. The district court in Ackerman, similar to the ruling of the Magistrate Judge here, entered summary judgment for the employer after emphasizing that a procedural defect in notice does not give rise to a substantive remedy and finding no extraordinary circumstances to warrant deviating from the general rule. On appeal, we acknowledged the validity of this general rule, but stated that nonetheless there are situations, usually presenting extraordinary circumstances, where the remedy of striking a plan amendment may be available. Ackerman, 55 F.3d at 125 n.8. The two such situations delineated in Ackerman were "where the employer has acted in bad faith, or has actively concealed a change in a benefit plan, and the covered employees have been substantially harmed by virtue of the employer's actions." Id. at 125.

In reversing the grant of summary judgment in Ackerman, we focused on the active concealment exception. We noted (1) the complete failure to provide the handbook to the Altoona employees; (2) the failure to hold scheduled meetings with Altoona employees; (3) the issuance of a potentially misleading letter to the employees concerning "changes" to the severance program rather than the termination of the program; and (4) the hostile employment climate at the Altoona plant. Id. at 125. We concluded that a reasonable factfinder could infer that the employer actively concealed the change in the severance policy in

11

order to prevent employees at the Altoona plant from leaving, and remanded for further findings.

In this case, the Magistrate Judge, construing our opinion in Ackerman to limit the circumstances for ordering rescission to employer bad faith or active concealment of the notice of termination, concluded that Lettrich produced no such evidence. The Magistrate Judge distinguished Ackerman on the ground that Ackerman presented "suspicious circumstances" which the employer tried to explain as bureaucratic bungling and that the employer admitted that not all of the employees had received notice of the rescission of the policy within the required 210 days of the end of the plan year in which the change was adopted. Report and Recommendation at 8. The Magistrate Judge concluded that the J.C. Penney situation was different because "Plaintiff did receive the notice although it was buried in the Notice of 1993 Annual Meeting of Stockholders and Proxy Statement."

It appears that the Magistrate Judge construed the concept of active concealment too narrowly. J.C. Penney's actions here are similar to those of Warnaco, the employer in Ackerman. Like Warnaco, it held no meeting for the employees to advise them of the change in policy. Like Warnaco, it sent no letter (other than the Notice of Meeting) to each employee. Like Warnaco, J.C. Penney, at least at the inception, was desirous of keeping its employee staff intact. In Ackerman, we stated: "While we do not rule out the possibility that administrative error accounted for Warnaco's omissions, we conclude that a reasonable fact finder could infer from these facts and from the plaintiffs' evidence regarding the employment climate at the Altoona plant that Warnaco actively concealed the change to its severance policy in order to prevent employees at the Altoona plant from leaving." 55 F.3d at 125.

Ackerman is not the only case where we raised the possibility of voiding a rescission of an employees' benefits plan for inadequate notice. In Ackerman, we noted that in Schoonejongen v. Curtiss-Wright Corp., 18 F.3d 1034, 1040 (3d Cir. 1993), reversed on other grounds, 514 U.S. 73 (1995) (in a portion of the opinion that had not been expressly reversed by the Supreme Court), we distinguished

12

between cases where the court is asked to void a plan amendment and cases where plaintiffs seek benefits that were not provided in the plan. Ackerman, 55 F.3d at 125 n.8. We also noted in Ackerman that in our prior opinion in Hozier v. Midwest Fasteners, Inc., 908 F.3d 1155 (3d Cir. 1990), we "implicitly recognized the possibility of striking down a plan amendment where there has been a reporting and disclosure violation concerning the amendment." Id. (citing Hozier, 908 F.3d at 1168–69 n.15).

In other circuits as well, the courts have suggested that notwithstanding the general rule that plan amendments are valid in spite of inadequate notice, participants may recover the benefits under the plan before the amendment if they can demonstrate cognizable prejudice from the company's failure to fully comply with ERISA's disclosure requirements, see Veilleux v. Atochem North Am., Inc., 929 F.2d 74, 76 (2d Cir. 1991) (per curiam), make a showing of "bad faith, active concealment, or detrimental reliance," see Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 569 (7th Cir. 1995), or "show active concealment of the amendment . . . or some significant reliance upon, or possible prejudice flowing from the lack of notice," see Godwin v. Sun Life Assur. Co. of Canada, 980 F.2d 323, 328 (5th Cir. 1992) (internal quotations omitted). Although the circumstances in those cases did not persuade those courts to disregard the plan amendment, this court's holding in Ackerman establishes that if a plan administrator actively conceals a material change in welfare benefits from an employee, and the employee relies to his or her detriment on that omission by the administrator, we will invalidate the change as to that employee. Ackerman, 55 F.3d at 125. Our holding there is consistent with Congress's intent that the ERISA notice and disclosure provisions guarantee that"the individual participant knows exactly where he [or she] stands with respect to the plan." H.R. Rep. No. 93–533, p. 11 (1973), reprinted in 1974 U.S.C.C.A.N. 4639, 4649; see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117 (1989).

We do not suggest that the circumstances of this case compel a finding of active concealment sufficient to void the termination of the separation pay program as to Lettrich.

13

Nor do we imply that an inference of bad faith or active concealment may arise simply from a failure to comply with ERISA's reporting and disclosure requirements. However, in light of the similarity in the circumstances here and in Ackerman, Lettrich's case should not have been dismissed on summary judgment.[2]

We conclude that Lettrich presented sufficient evidence of active concealment to survive summary judgment. When considered in a light most favorable to Lettrich, the placement of the termination notice without providing any warning to participants that significant information regarding welfare benefits was enclosed deep within -- combined with J.C. Penney's failure to use its established and effective internal procedure for notifying employees of important changes in benefits -- could support a reasonable inference by a factfinder that J.C. Penney intended to conceal the program's termination from affected employees. As it is currently uncontested that Lettrich resigned from his position at Thrift Drug in reliance on the separation pay program, summary judgment for J.C. Penney was inappropriate.

IV.

We will accordingly reverse the grant of summary judgment for J.C. Penney and remand this case to the District Court for further proceedings in accord with this opinion.

_____

2. It appears that Lettrich also contends that he is entitled to receive the
separation pay benefits under the theory of equitable estoppel. See, e.g., International Union, United Auto., AeroSpace & Agric. Implement Workers of Am. v. Skinner Engine Co., 188 F.3d 130, 152 (3d Cir. 1999); Kurz v. Philadelphia Elec. Co., 96 F.3d 1544, 1553-1554 (3d Cir. 1996). Given our disposition of this case, we need not consider that argument here. We do not preclude Lettrich from raising that argument on remand, at which point the court would need to decide whether equitable estoppel offers an independent basis for Lettrich's claim to benefits.

14

ROTH, Circuit Judge, Dissenting:

Unlike the majority, I do not find a similarity between the circumstances here and those in Ackerman v. Warnaco, Inc., 55 F.3d 117 (3d Cir. 1995), sufficient to prevent the award of summary judgment to J.C. Penney Co. For that reason, I respectfully dissent.

As the majority discusses, the statute, 29 U.S.C. S 1102(a)(1), requires that any change or modification to a welfare plan be in writing and that the plan administrators furnish participants with a summary of any material modifications, written in a manner calculated to be understood by the average participant. However, as we recognized in Ackerman, defects in fulfilling ERISA's reporting and disclosure requirements do not "under ordinary circumstances" give rise to a substantive remedy. Id. at 124. We will allow the remedy of recission of an amendment to a plan only under the extraordinary circumstances "where the employer has acted in bad faith, or has actively concealed a change in the benefit plan, and the covered employees have been substantively harmed by virtue of the employer's actions." Id. at 125.

In Ackerman, the plaintiffs were production workers in an apparel factory. Unlike other plants operated by Warnaco, no meeting was ever held at plaintiffs' plant to inform them of the elimination of the termination allowance and no employees at their plant ever received a copy of the updated plan handbook. We remanded the case so that the District Court could determine whether under such circumstances Warnaco could have acted in bad faith or actively concealed the rescission of the allowance.

In the present case, on the other hand, all participants in the Separation Allowance Program were profit sharing, management level employees and all were shareholders of the company. When J.C. Penney terminated the plan, notice of the termination was included in Notice of Meeting of the next shareholders meeting. Program participants, being shareholders, had an interest in the notice of the shareholders' meeting. A Notice of Meeting is a type of communication which will be understood by management level, shareholder employees. Whether the notice of

15

termination, entitled Separation Allowance Program, appeared on page 1 or page 30 or page 62 of the Notice of Meeting, it was directed at employees who were experienced in business affairs and interested in what would transpire at the shareholders meeting.

I would conclude that this type of notice to this level of participants satisfies the statutory notice requirements. The majority, however, not only concludes that it does not satisfy the notice requirements, the majority has even greater problems with the notice, concluding that it could support a reasonable inference that J.C. Penney intended to conceal the program's termination from affected employees. If the affected employees had been production workers in an apparel factory, perhaps. However, they were not. They were management level, profit-sharing shareholders in the company.

Moreover, the Vice President of Human Resources, who was responsible to promote and implement the program, knew of its termination. He informed any participants, who asked him about its status, that it had been terminated.

For all the above reasons, I cannot conceive how this type of notice can constitute bad faith or active concealment on the part of J.C. Penney. In view of the circumstances of this case, which I do not find to be extraordinary  ones, I would affirm the judgment of the District Court in favor of J.C. Penney.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

16