[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Aug. 11, 2009
THOMAS K. KAHN
CLERK

No. 09-11287
Non-Argument Calendar
_____

D. C. Docket No. 07-01298-CV-BE-M

MIKE RUPLE,

Plaintiff-Appellant,

versus

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(August 11, 2009)

Before BIRCH, HULL and KRAVITCH, Circuit Judges.

PER CURIAM:

Mike Ruple appeals a summary judgment ruling entered in favor of Hartford

Life and Accident Insurance Company ("Hartford"). Ruple filed this lawsuit

under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., seeking reinstatement of long-term disability benefits, which Hartford had denied after determining that he was not disabled within the meaning of the applicable benefits policy. The district court found that Hartford's decision to deny benefits was not wrong and granted summary judgment for Hartford. We agree with the district court and affirm.

**BACKGROUND**

Ruple's former employer had in place a disability benefits policy ("the policy") as part of its employee welfare benefit plan. The policy was originally administered by Continental Casualty Company, aka CNA, ("CCC"), but in 2004 Hartford took over administration of claims made under the policy.

The policy had a short-term disability benefits portion providing disability benefits if the employee was unable to perform his regular occupation. These short-term benefits would be paid for 36 months. After the 36-month period, the employee would have to demonstrate eligibility for long-term disability benefits in order to continue receiving disability benefits.

The long-term disability portion stated:

After the Monthly Benefit has been payable for 36 months, "Disability" means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:

2

(1) continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and (2) not working for wages in any occupation for which You are or become qualified by education, training or experience.

Additionally, the policy required the claimant to provide proof of disability.

The policy stated, in relevant part:

> **Proof of Disability**
> The following items, supplied at Your expense, must be a part of Your proof of loss. Failure to do so may delay, suspend or terminate Your benefits:
> . . .
> 5. Objective medical findings which support *Your Disability*. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly [*sic*] accepted in the practice of medicine, for *Your* disabling condition(s).

Ruple ceased work for his employer in January 1999 due to back pain, and began receiving short-term disability benefits from CCC. Later, CCC began paying Ruple long-term disability benefits. At some point, CCC terminated long-term benefits and Ruple filed suit. CCC and Ruple requested dismissal of the suit pursuant to a settlement agreement in 2004; CCC then resumed paying long-term disability benefits to Ruple. After Hartford took over administration of the policy, Hartford reviewed Ruple's claim, determined that he was not disabled within the meaning of the policy that same year, and terminated his benefits.

Hartford's administrative record contained the following evidence submitted by Ruple in support of his claim that he was disabled from any occupation and thus entitled to long-term disability benefits:

Ruple saw a neurosurgeon in August 1999 who noted that Ruple's cervical and lumbar MRI studies revealed "no evidence of any abnormality." The surgeon did not recommend surgery.

Records from the Birmingham Pain Center, where Ruple was a patient starting in January 1999, indicated that Ruple was initially seen by Dr. Cheryl Goyne who stated that Ruple had "chronic low back pain with symptoms suggestive of right L5-S1 radiculopathy" and that "[h]is exam is quite benign." She also wrote "[j]ust need to keep the possibility in mind that this patient may ultimately be seeking disability to help alleviate the burden of child support." At his next visit on February 25, 1999, Dr. Goyne noted that the C-spine MRI was read out as normal but that some abnormalities were shown on the thoracic MRI. Dr. Goyne also wrote

> The patient did bring up the subject of disability today. He apparently has a good disability policy through work. I was very clear with him that I do not think that this is a disabling lesion. I think that it would be in his best interest to try to retrain to do something else but I cannot say that he is disabled on the basis of these small thoracic disks and I do think we can get him better with proper pain management.

4

In May of that year, Dr. Goyne noted that Ruple was in a fair amount of pain. In a follow-up appointment, however, Dr. Goyne found that he was "pretty much back to baseline," although still having some pain. She also stated

> The big issue with him right now is disability. His short-term disability will be up in six weeks . . . As I told him, my feeling is that it would be most wise to retrain for another position within his company. I did feel that it would be difficult for him to continue his present work with the problems he has in his thoracic spine and do consider his work somewhat risky given that it would not be difficult for him to have thoracic compression if he were to rupture one of the protruded disks. However, I do not feel that his present injury should result in a permanent total disability and again I think he should look towards retraining.

After that visit, Ruple switched to a different doctor at the Birmingham Pain Center – Dr. Gossman. Dr. Gossman noted in June 1999 that Ruple seemed to be experiencing pain, but that "[o]bviously, this is a situation where there could be some addictive / manipulative problem. However, I am going to give him the benefit of the doubt at this point in time and try to work with him." In July, Dr. Gossman wrote that Ruple is still not working and reported that the pain wakes him at night. Dr. Gossman, however, stated that he was "a bit concerned" and that Ruple's "MRI does not look very significant," that he "moves fairly comfortably in the office when we are not discussing pain [including] bending over to pick up things," and that Ruple "really does not look that uncomfortable." Dr. Gossman

5

encouraged Ruple "to seek employment and talk with his workplace about the possibility of working a modified schedule of some sort." Over the next few months, Ruple received a series of thoracic epidural steroid injections which reportedly brought him significant relief.

In 2002, CCC determined that Ruple was no longer entitled to benefits under the policy. Its letter referred to a report by Dr. Heather Sabo that Ruple was able to perform alternative work with no lifting over 10 pounds, standing and walking for 4 hours per day and sitting for 8 hours per day with breaks as needed. CCC also discussed a vocation assessment which identified available gainful occupations that Ruple could perform. This denial led to his first lawsuit which, as stated above, ended in a settlement and reinstatement of benefits.

In November 2004 after taking over administration of the policy, Hartford interviewed Ruple. Ruple stated that he could not pass a physical to work as a truck driver because of all the pain medications he was taking and that he spent most of his time in a recliner. He did not believe that he could retrain for another occupation because he would not be able to sit through a class. Ruple also revealed that he joined a 1000 acre hunting club where he hunted deer; the hunting location was an hour away.

6

In March 2005, Hartford arranged for video surveillance of Ruple. On two instances, Ruple was observed driving around town on errands and ambulating normally. Hartford requested additional information from Ruple; the record shows that Hartford noted that Ruple "advised that he does not cook, doesn't tend to laundry, performs no chores outside the home, no shopping, and limits his driving to a few minutes at a time."

Hartford requested updated information in January 2006 and informed Ruple that two of his previous doctors indicated that they had not seen him for many years. During a phone call with Hartford, Ruple admitted that he drove up to two and a half hours at a time. Dr. Timothy Bunker, Ruple's treating physician at the Birmingham Pain Center, completed a functional assessment, in which he expressed his opinion that Ruple was capable of doing full-time sedentary work.

Hartford assessed the above information, noted that Ruple had a GED, and concluded that Ruple would be capable of performing a sedentary occupation, including "sorter, appointment clerk, and credit card clerk." Hartford found that such positions were available in the area where Ruple lived and terminated his long-term disability benefits. Ruple appealed through Hartford's review process.

While Hartford was reviewing Ruple's appeal, Dr. Bunker submitted a letter to Hartford dated April 26, 2006. In the letter, Dr. Bunker wrote that he had filled

out Ruple's functional assessment at a time when "he really didn't have a good handle to which patient" he was referring. He stated his updated opinion that Ruple's "function is actually less than sedentary. He is actually permanently and totally disabled and this mostly due to the fact that he is on very strong narcotic pain medication . . . I don't feel a person requiring this heavy medication [is] able to perform any gainful employment." Hartford then collected Ruple's medical records from Dr. Bunker. The records included lab reports revealing Valium in Ruple's system, which had not been prescribed, and no Klonopin, which had been prescribed. Ruple told Dr. Bunker in November 2005 that his lower and mid back pain was "controlled to an 'ok' level." In January 2006, Dr. Bunker reported that Ruple "walks a lot" for exercise. In June 2006, Dr. Bunker terminated his patient relationship with Ruple. He wrote to Ruple

> On your last office visit with me and my staff, you had a urine drug screen performed that was inconsistent with your controlled medicines. On three separate occasions you tested positive for Valium and on one occasion Xanax. You are not prescribed any of these by this clinic . . . Also, you have been prescribed Klonopin, which was never present in the urine drug screens.

Dr. Bunker also noted that when Ruple was asked to bring in his medicines for a pill count, he failed to bring in all medications. Dr. Bunker noted that Ruple had "been consistently non-compliant with my treatment plan," and also referred him

to an "intensive in-patient detoxification and drug rehabilitation program if [Ruple felt] that it is right for [him]."

After that time, Ruple began seeing Dr. Odene Connor for pain management. The records submitted from Dr. Connor include MRIs showing mild abnormalities. Ruple reported to Dr. Connor that his pain medication was "fair" and "effective." Dr. Connor did not submit an opinion on Ruple's status.

Hartford requested that Dr. Dennis Ogiela, a board-certified orthopedist, conduct a peer review opinion. Dr. Ogiela wrote that the most recent MRIs showed "minimal objective changes" from previous images. Dr. Robert Pick, another board-certified orthopedic surgeon, took over the peer review after Dr. Ogiela became ill. After conducting a full review of Ruple's medical records, Dr. Pick stated

> [I]t is my considered medical opinion, to a reasonable degree of medical certainty, that as of 3/31/06 no substantive objective orthopedic findings have been documented in the file and Mr. Ruple was able – objectively – to engage in full time work activities in at least the light-medium level category.
> . . .
> The medical documentation lacks any substantive objective findings to validate and substantiate Mr. Ruple's stated subjective symptoms and complaints.
> . . .
> In summary, based on review of the records, it is my considered medical opinion, to a reasonable degree of medical certainty, that the

9

overwhelming issue at hand is Mr. Ruple's stated subjective symptoms and complaints.

Dr. Pick noted Ruple's medication use, but believed that such use would not "preclude him or render him incapacitated and unable to perform a sedentary level occupation which requires an average level of intelligence and concentration . . . ."

After reviewing the above evidence, Hartford concluded that Ruple was not eligible for long-term disability benefits under the policy and terminated his benefits on February 23, 2007. Ruple filed the instant lawsuit, requesting review of Hartford's decision. Based on the administrative record, the Magistrate Judge determined that Hartford was not wrong to deny Ruple long-term disability benefits. The district court adopted the Magistrate Judge's Report and Recommendation and granted summary judgment to Hartford.

## STANDARD OF REVIEW

We review the district court's summary judgment ruling de novo, applying the same legal standards that governed the district court's decision. Williams v. Bellsouth Telecommunications, Inc., 373 F.3d 1132, 1134 (11th Cir. 2004).

## DISCUSSION

*Res Judicata*

10

Ruple first argues that Hartford is barred from denying that he is entitled to long-term disability benefits because of the prior lawsuit and ensuing settlement between Ruple and CCC. Because the prior lawsuit ended in a dismissal by stipulation of the parties pursuant to a settlement agreement, preclusion depends on the settlement agreement rather than on the complaint. Norfolk S. Corp. v. Chevron, U.S.A., Inc., 371 F.3d 1285, 1288 (11th Cir. 2004) ("Where the parties consent to such a dismissal based on a settlement agreement, however, the principles of res judicata apply (in a somewhat modified form) to the matters specified in the settlement agreement, rather than the original complaint."). In order to determine what claims are barred as a result of the settlement agreement, we look to the agreement itself to determine what claims the parties intended to be finally and forever barred by the dismissal. Id. "[T]he scope of the preclusive effect of the . . . [d]ismissal should not be determined by the claims specified in the original complaint, but instead by the terms of the Settlement Agreement, as interpreted according to traditional principles of contract law." Id.

Here, the parties disagree as to what was finally resolved in the settlement agreement. Ruple contends that the parties agreed that Ruple was totally disabled within the meaning of the policy and thus entitled to permanent long-term benefits. Hartford asserts that the prior litigation resolved only Ruple's disability

11

status as of July 2002 and left open the question of his long-term disability subject to further inquiry. A thorough review of the record has not shown that a copy of the settlement agreement was ever put into evidence. Nor has Ruple ever discussed the content of the agreement in his arguments, and we are thus unable to determine what claims the prior settlement agreement covered and would therefore bar a subsequent lawsuit. Ruple, as the party attempting to assert res judicata, bears the burden of proving that the preclusive doctrine applies. In re Piper Aircraft Corp., 244 F.3d 1289, 1296 (11th Cir. 2001). Ruple has failed to establish that the parties' previous settlement bars the instant lawsuit.

*Standard of Review*

Ruple argues that the Magistrate Judge – and thus the district court by adopting the Magistrate Judge's Report and Recommendation – applied the wrong standard of review to the summary judgment motions. The Magistrate Judge stated that "the typical summary judgment analysis does not apply to ERISA cases." The Magistrate Judge is correct that the standard of review applicable to ERISA cases is somewhat different than in other cases. In determining whether a denial of benefits was proper we review the decision of the policy administrator only to determine whether the administrator was arbitrary and capricious. Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989). To

12

accomplish this review, the Supreme Court established three standards of review depending on the level of discretion granted to the Administrator under the terms of the plan: (1) de novo where the plan grants no discretion, (2) arbitrary and capricious if the plan grants the Administrator discretion, and (3) heightened arbitrary and capricious if the Administrator has discretion to grant or deny claims but it has a conflict of interest (because the same entity decides eligibility for benefits and pays out those benefits). Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).[1]

This court uses a multi-step analysis to guide these reviews of Administrator decisions and the various standards of review. HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993-95 (11th Cir. 2001). The analysis involves six steps:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

---

[1] Firestone developed these standards to review Administrator interpretations of plan language. Courts have also applied these standards to review factual determinations of benefits eligibility. Shaw v. Connecticut General Life Ins. Co., 353 F.3d 1276, 1285 (11th Cir. 2003).

13

(3) If the administrator's decision is "<u>de novo</u> wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

<u>Williams</u>, 373 F.3d at 1138; <u>see also</u> <u>Doyle v. Liberty Life Assurance Co. of Boston</u>, 542 F.3d 1352, 1360-61 (11th Cir. 2008) (upholding a district court's analysis following the above steps after <u>Metro. Life Ins. Co. v. Glenn</u>, – U.S. –, 128 S.Ct. 2343 (2008)).[2]  The Magistrate Judge correctly recognized and applied the above standard of review.

*May Hartford and the Court Require Objective Medical Evidence of Disability?*

Ruple argues that Hartford acted arbitrarily and capriciously by terminating his benefits due to a lack of objective medical evidence supporting his claimed disabling back pain.  The policy involved in this case clearly requires "[o]bjective medical findings which support [the claimant's] Disability.  Objective medical

---

[2] Because we decide this case at the first step of the analysis, <u>see</u> <u>infra</u>, we need not determine the level of discretion held by Hartford.

14

findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for [the] disabling condition(s)." Accordingly, Hartford did not act arbitrarily or capriciously in requiring the kind of evidence that is explicitly required under the policy.

Additionally, when the court makes its own determination of whether the administrator was "wrong" to deny benefits under the first step of the Williams analysis, the court applies the terms of the policy. See 29 U.S.C. § 1104(a)(1)(D) (providing that an ERISA plan administrator must "discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]."); Oliver v. Coca-Cola Co., 497 F.3d 1181, 1195 (11th Cir. 2007) ("To determine whether the administrator's denial of benefits was arbitrary and capricious, we begin with the language of the Plan itself.").[3]  Thus, the Magistrate Judge did not acted improper by requiring objective medical findings where such evidence is required under the terms of the policy. Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1358 (11th Cir. 2008) ("The

---

[3] The policy involved in this case actually requires objective medical findings within its terms; this case is thus distinguishable from those cases where we have found that the plan administrator acted arbitrarily and capriciously in demanding objective evidence not required by the plan itself. See Oliver, 497 F.3d at 1196-97 (rejecting the administrator's denial of benefits due to a lack of objective evidence of disability where no "provision of the Plan requires 'objective evidence' of a disability").

policy defines 'proof' as including 'chart notes, lab findings, test results, x-rays and/or other forms of *objective medical evidence* in support of a claim for benefits.' Therefore, it was reasonable for Liberty Life to rely only on objective medical evidence supporting Doyle's claim . . . .") (emphasis in original).

*What Medical Evidence Does the Court Review?*

Ruple next argues that he was entitled to submit new evidence to the court for consideration in the court's review of Hartford's decision. Our law is clear, however, that even under the first step of the BellSouth analysis, where the court determines whether the administrator was wrong under a "de novo" standard, "[w]e are limited to the record that was before [the administrator] when it made its decision." Glazer v. Reliance Standard Life Ins., 524 F.3d 1241, 1247 (11th Cir. 2008); Jett, 890 F.2d at 1139. Accordingly, the Magistrate Judge appropriately refused to allow Ruple to submit new evidence not contained in the administrative record before Hartford. Thus, we will not review Ruple's affidavit or the opinion of Dr. Salisbury, Ruple's current pain management physician, which Ruple acknowledges were not part of the record before Hartford.

It is unclear whether Ruple's Social Security disability award was part of the record before Hartford. Ruple asserts that he submitted evidence of the award to CCC, Hartford's predecessor, and yet also argues that the award is "new

16

evidence" which the court should have considered in its de novo review of the administrator's decision. A letter from Hartford dated March 14, 2005 acknowledges that Ruple received Social Security benefits, but did not discuss the details of the decision to award those benefits. Regardless of whether the award was before Hartford, Hartford did not err in rejecting the award as evidence of Ruple's disability. The Social Security Administration's determination that an individual is or is not disabled under its statutes and regulations does not dictate whether that same individual is disabled under the terms of an ERISA policy. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) ("We note that the approval of disability benefits by the Social Security Administration is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan."). Although the court may consider the award in reviewing an ERISA administrator's decision, Kirwan v. Marriott Corp., 10 F.3d 784, 790 n. 32 (11th Cir. 1994), the court is not bound to do so.[4]

---

[4] Furthermore, the Social Security Administration explicitly limited its decision. In its September 11, 2002 decision, the Administrative Law Judge stated that "[c]laimant is a younger individual and, with proper medical treatment, his condition would be expected to improve over time; it is therefore recommended that the claimant's file be reviewed in eighteen months to determine if he has experienced sufficient medical improvement to return to gainful employment." This language makes clear that the Social Security award is not relevant to the question of Ruple's long-term disability status beyond the eighteen months for which the Social Security decision stated it would apply. Hartford's decision to deny benefits was rendered in March 2006, significantly beyond eighteen months past September 2002, and therefore neither Hartford nor this court was required to consider the Social Security award.

*The Burden of Proof*

Ruple next argues that the burden should have been on Hartford to prove that he was no longer entitled to benefits. Although Ruple acknowledges that the burden ordinarily rests with the person claiming benefits under an ERISA plan, see Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998), he contends that because Hartford once gave benefits the burden shifts to Hartford to prove that he is no longer entitled to benefits. Ruple relies on Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321 (11th Cir. 2001) to support his argument that the burden shifts to the administrator to disprove disability once the administrator has begun paying benefits. We disagree with Ruple's reading of Levinson. Levinson does discuss a "burden shifting" away from the claimant and onto the administrator because the claimant had carried his burden of proving that he was "totally disabled" within the meaning of the plan. Id. at 1331. Levinson does not hold that one payment of benefits binds the administrator to payments forever. Furthermore, Levinson is distinguishable from the present case. In that case, the court found that the medical evidence was completely one-sided; the claimant had produced ample evidence of his continuing disability and there was scant evidence in the administrative record supporting the administrator's finding that the claimant was not disabled. Id. Here, the evidence

18

was not so one-sided or conclusive in favor of a finding that Ruple was disabled so as to shift the burden to Hartford.[5] Additionally, the policy required Ruple to produce evidence of an ongoing disability. Nothing in the policy stated or implied that once long-term benefits were granted, the claimant would forever be entitled to them.

*Eligibility for Benefits*

Having resolved Ruple's procedural arguments, we turn to the merits of Ruple's claim that Hartford acted arbitrarily and capriciously in denying him long-term disability benefits. Under the <u>Williams</u> analysis, we start with the question of whether, in our opinion, Hartford was wrong to deny benefits. 373 F.3d at 1138. After a thorough review of the record before Hartford, we conclude that Hartford was not wrong to deny Ruple long-term disability benefits under the policy.

The policy clearly requires that a claim for disability must be supported by "objective medical findings." Ruple's records show a dearth of such objective evidence. The first neurosurgeon that Ruple saw in 1999 found no evidence of abnormality in his MRI scans. Dr. Goyne, his first physician at the Birmingham Pain Center, acknowledged his subjective reports of pain and some slight

---

[5] Because we hold that <u>Levinson</u> does not apply to these facts, we need not address Hartford's contention that <u>Levinson</u> has been overruled.

19

abnormalities on his thoracic MRI , but expressed that she did "not think that this is a disabling lesion." She also stated her belief that she did "not feel that his present injury should result in a permanent total disability" and advised him to "look towards retraining" for alternative employment. The MRI images submitted by Dr. Connor did reveal disc bulges, early degenerative disc disease, and some central disc herniation. No opinion from Dr. Connor was submitted, however, which indicated that such abnormalities supported Ruple's assertions of pain. Dr. Pick, who performed the peer review, stated that the latest MRIs showed little change from prior tests, gave his opinion that there were "no substantive objective orthopedic findings," and wrote that he believed Ruple capable of full time work in the light to medium level category. These doctors all felt that there was an absence of objective medical findings – as required by the policy – establishing Ruple's disability. Furthermore, although Dr. Bunker did submit a letter asserting his opinion that Ruple required high levels of pain medications and was totally disabled, Dr. Bunker later withdrew from the physician-patient relationship with Ruple, noting Ruple's non-compliance with treatment and prescriptions.

To the extent that Ruple's subjective pain alone could support a claim for long-term disability benefits, there is a lack of clear evidence of such pain and significant evidence supporting Hartford's conclusion that his pain was not as

20

extensive or debilitating as Ruple reported it to be. Dr. Goyne repeatedly expressed her opinion that Ruple's pain was not so severe that he should be considered permanently disabled and unable to work. Dr. Gossman initially gave Ruple the "benefit of the doubt" despite Ruple's soured relationship with Dr. Goyne, but later indiciated skepticism about Ruple's pain levels. Dr. Gossman noted that Ruple "moves fairly comfortably in the office when we are not discussing pain [including] bending over to pick up things" and that he "really does not look uncomfortable." After seeing this ease of movement, Dr. Gossman advised Ruple to seek employment. Additionally, Hartford's surveillance and interviews with Ruple revealed more mobility than reported by Ruple. Ruple reported that he had joined a hunting club, would hunt deer at a location an hour's drive away, and had at times driven up to two and a half hours at a time. The surveillance showed Ruple driving around town and running errands – activities which Ruple had earlier stated he could not perform. Also, Dr. Bunker noted that Ruple was able to walk a lot for exercise. This evidence substantially undercuts Ruple's claims that he was totally disabled as a result of experiencing extreme pain. Even though the record before Hartford did contain some evidence from Ruple that he was experiencing debilitating pain, the weight of the evidence favors a conclusion that his pain was not completely disabling.

21

Accordingly, the above evidence demonstrates that Hartford was not "wrong" to deny Ruple long-term disability benefits under the policy.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court to grant summary judgment in favor of Hartford.