**Anna M. NEBESNY–FENDER,
Plaintiff**

v.

**AMERICAN AIRLINES,
INC., Defendant.**

**Case No. 08–61858–CIV–JORDAN.**

United States District Court,
S.D. Florida,
Miami Division.

Jan. 11, 2011.

Lawrence David Bache, Pembroke Pines, FL, for Plaintiff.

Terence G. Connor, Hunton & Williams, Miami, FL, for Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

ADALBERTO JORDAN, District Judge.

After considering the arguments of counsel, the stipulations of the parties, and the evidence presented at the bench trial held in this case, I make the following findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## I. THE EVIDENCE PROPERLY CONSIDERED

This case, brought under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq., concerns American Airlines' denial of Anna Nebesny–Fender's request to re-enroll in the prefunding plan for retiree medical coverage with credit for previous years of enrollment. The plan administrator ruled against Ms. Nebesny–Fender, finding that, by not returning to American her refund of prefunding plan contributions within 90 days of her return to work, she had forfeited her right to re-enroll in the prefunding plan with credit.

In December of 2009, I denied the parties' motions for summary judgment because there were material issues of fact as to whether Ms. Nebesny–Fender received notice about relevant changes to the prefunding plan, and reserved ruling on whether evidence outside the administrative record would be considered at trial.

*See* Order Denying Motions for Summary Judgment [D.E. 53] at 7–8 (Dec. 8, 2009). At trial, I allowed the parties to introduce evidence that was not in the administrative record, but again reserved ruling on whether such evidence was admissible. I now conclude, for the reasons which follow, that my review in this case is confined to the administrative record.

■ Ms. Nebesny–Fender and American agree that the plan gives the administrator discretion to interpret and apply its terms. They also agree that, under governing ERISA principles, *see, e.g., Conkright v. Frommert,* — U.S. ——, 130 S.Ct. 1640, 1646, 176 L.Ed.2d 469 (2010), the administrator's decision in this matter should be reviewed under the arbitrary and capricious standard.[1]

■ Under that standard, the task of a district court is to determine whether there is a "reasonable basis for the [administrator's] decision based upon the facts as known to the administrator at the time the decision was made." *See, e.g., Glazer v. Reliance Standard Ins.,* 524 F.3d 1241, 1246 (11th Cir.2008); *Jett v. Blue Cross & Blue Shield of Ala.,* 890 F.2d 1137, 1139 (11th Cir.1989). The same standard applies to both factual findings and legal conclusions by the administrator. *See Paramore,* 129 F.3d at 1451.

■ If that is how the standard operates, then it would seem inappropriate to consider evidence outside the administrative record. In fact, the Eleventh Circuit has noted, in an unpublished opinion, that when applying the arbitrary and capricious standard in an ERISA action a district court "sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrator's determination in light of the record compiled before the plan fiduciary." *See Curran v. Kemper Nat'l Servs.,* No. 04–14097, 2005 WL 894840, *7 (11th Cir.2005) (per curiam). Unlike a typical summary judgment scenario, the district court's job in a case like this one is not to determine whether there are material issues of fact, but rather whether the administrator's findings are reasonable. *See Glazer,* 524 F.3d at 1246 ("Glazer argues that the district court erred when it granted summary judgment because there were factual disputes about whether [she] was disabled, but this argument misunderstands our standard of review. Our review of a denial of benefits is whether the decision of the administrator was arbitrary and capricious.").

These principles, which seem relatively straightforward, would seem to call for review to be limited to the administrative record compiled below. But things are not as simple as they seem.

First, in a number of ERISA cases applying the arbitrary and capricious standard, the Eleventh Circuit has reversed grants of summary judgment and remanded for trial at which the district court was to make independent findings of fact. *See, e.g., Tippitt v. Reliance Standard Life Ins.,* 457 F.3d 1227, 1237 (11th Cir.2006) (*Tippitt I* ) (remanding to district court, in case involving "heightened" arbitrary and capricious review, for findings about employee's ability to perform certain duties

---

1. The parties here do not quarrel over the interpretation of the language in the prefunding plan as amended. Their dispute, instead, is over the administrator's findings that American provided proper notice to Ms. Nebesny–Fender about the amendments to the prefunding plan, and that Ms. Nebesny–Fender was aware of the requirement that she return her refund of prefunding plan contributions within 90 days of her return to work at American. Those findings are factual in nature, but in the Eleventh Circuit the same arbitrary and capricious standard applies to legal conclusions and factual findings. *See Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1451 (11th Cir.1997).

even though administrator had found that employee could carry out duties of his occupation);[2] *Merritt v. Fed. Express Corp.*, 185 Fed.Appx. 891, 892–95 (11th Cir.2006) (per curiam) (reversing grant of summary judgment in favor of administrator in case involving "heightened" arbitrary and capricious review and remanding for factual findings as to when employee received benefit information packet, even though administrator had found that employee did not receive package in November of 2003, as he had claimed). Although it is unclear whether the Eleventh Circuit intended for the district courts in *Tippitt I* and *Merritt* to consider evidence outside the administrative record on remand, simply making new factual findings would seem to cut against the notion that arbitrary and capricious review focuses on the findings and conclusions of the administrator based on the record before it.

Second, in other ERISA cases applying the arbitrary and capricious standard, the Eleventh Circuit has said that a district court can consider an administrator's "post-hoc explanation" for denial of benefits. *See, e.g., Marecek v. BellSouth Telecomms.*, 49 F.3d 702, 707 (11th Cir.1995); *Tippitt v. Reliance Standard Life Ins.*, 276 Fed.Appx. 912, 915–16 (11th Cir.2008) (*Tippitt II* ). A post-hoc explanation, however, by definition is not part of the administrative record. Thus, cases like *Marecek* and *Tippitt II* are in some tension with the notion that review in a case like this one is limited to the administrative record. *See also Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 520 (1st Cir.2005) ("There may be times when it is appropriate for courts to hear new evidence. Where the challenge is not to the merits of the decision to deny benefits, but to the procedure

used to reach the decision, outside evidence may be of relevance.").

■■■ On balance, I conclude that I should generally limit my review concerning historical facts to the administrative record. For starters, the earliest Eleventh Circuit opinion on the issue, *Jett,* 890 F.2d at 1139, holds that review is "limit[ed] ... to ... the evidence that was before" the administrator, and that a district court should not make findings of fact based upon subsequent evidence or testimony. In case of any intra-circuit conflict the first decision establishing the legal principle controls, *see, e.g., SEC v. Ginsburg,* 362 F.3d 1292, 1298 (11th Cir.2004), so *Jett* governs. In addition, relatively recent Eleventh Circuit opinions (albeit unpublished ones) are consistent with *Jett. See, e.g., Ruple v. Hartford Life & Accident Ins.,* 340 Fed.Appx. 604, 612 (11th 2009) (per curiam) ("[T]he magistrate judge appropriately refused to allow Ruple to submit new evidence not contained in the administrative record."); *Mack v. Metro. Life Ins.,* 246 Fed.Appx. 594, 595 (11th Cir.2007) (per curiam) ("[W]hen a plan grants its administrator discretionary authority to interpret it ... the parties may not generally introduce new evidence of disability in the district court, so the case must be decided on the administrative record...."); *Lipsey v. Union Underwear Pension Plan,* 146 Fed.Appx. 326, 330 n. 5 (11th Cir.2005) ("The [plan] also points to materials that were discovered after the committee determined that Lipsey was ineligible for benefits and to materials that Tuck may or may not have considered (she could not remember at trial). We do not consider these materials when determining whether the committee's decision was arbitrary and capricious."). Finally, the majority of circuits have held that, where the

---

**2.** For the Supreme Court's latest decision on how a conflict of interest should be factored into the arbitrary and capricious standard in ERISA cases, see *Metropolitan Life Insurance v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 2351–52, 171 L.Ed.2d 299 (2008).

ERISA standard of review is the arbitrary and capricious standard, a district court cannot consider evidence that is not in the administrative record. *See, e.g., Perlman v. Swiss Bank Corp.*, 195 F.3d 975, 982 (7th Cir.1999) ("[W]hen there can be no doubt that the application was given a genuine evaluation, judicial review is limited to the evidence that was submitted in support of the application for benefits, and the mental processes of the plan's administrator are not legitimate grounds of inquiry ....") (citing cases adopting majority view); *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir.1995) (vacating judgment in ERISA case in part because district court had improperly considered evidence outside administrative record: "While the district court did not rely on evidence outside the administrative record in determining that the Board acted arbitrarily and capriciously, it erred in considering extrinsic evidence during the bench trial to determine whether the private duty nursing care was medically necessary and therefore covered under the plan.").

 There is, however, a wrinkle. Ms. Nebesny–Fender's main contention is that American never gave her proper notice of the requirement that employees in her situation return all refunds of prefunding plan contributions within 90 days of their return to work. As explained later, where an ERISA claimant or beneficiary asserts that proper notice was not provided, relief is not available unless there is a showing of prejudice. While the issue of prejudice was not addressed by the administrator below, the administrative record nevertheless shows that the lack of notice caused Ms. Nebesny–Fender prejudice. Plus, the evidence presented at trial demonstrates

the same thing. *Cf. Merritt*, 185 Fed. Appx. at 896 (remanding for district court to determine when employee received plan packet which provided timetable for returning executed severance agreement).

## II. The Administrative Record

Ms. Nebesny–Fender worked at TWA from 1986 until TWA was acquired by American. She began working for American on January 1, 2002. When her employment at American began, Ms. Nebesny–Fender was automatically enrolled in American's prefunding plan for retiree medical coverage, a welfare plan governed by ERISA. This prefunding plan allows employees to pay for retiree medical coverage while they are employed and obtain certain tax benefits. *See* A.R. 454–55. As part of the prefunding program, American deducted $12.96 from Ms. Nebesny–Fender's paycheck each month. *See* A.R. 454–55. On September 12, 2002, Ms. Nebesny–Fender commenced medical leave. *See* A.R. 459. She was not required to contribute to the prefunding program while on leave. *See* A.R. 577.

### A. The Changes to the Prefunding Plan

In January of 2003, while Ms. Nebesny–Fender was on medical leave, but still an employee of American and a prefunding plan participant, American amended the prefunding program. The amendment terminated laid-off employees' participation in the program, refunded their contributions, and re-enrolled them upon reinstatement only at their request and their return of the refunded contribution within 30 days of reinstatement. *See* A.R. 461, 468 (employee information packet for those affected by reduction in force (RTF), revised February 20, 2003).[3]

---

3. The administrative record contains a copy of a summary of material modifications (SMM), generally effective January 1, 2003, which contains the amendments to the prefunding plan. *See* A.R. 173–76. Strangely enough, the SMM states that the changes to

the prefunding plan are effective September 28, 2001, *see* A.R. 173, but the parties have proceeded on the assumption that the effective date was January 1, 2003, *see* Parties'

American laid Ms. Nebesny–Fender off on April 26, 2003, as a result of a reduction in force. Her layoff notice did not contain any reference to a RIF packet. Ms. Nebesny–Fender elected to retain her right to be reinstated. *See* A.R. 456–59. While she was laid off, Ms. Nebesny–Fender was not required to make any contributions to the prefunding plan. On July 3, 2003, American sent a check for $126.55 to Ms. Nebesny–Fender as a refund of her prefunding plan contributions. The copy of the check in the record does not contain a legend indicating what it is for. Nor is there a stub attached to the check indicating the reason for the payment. *See* A.R. 587.

Some undated documents in the administrative record indicate that, at some point, Ms. Nebesny–Fender agreed to receive electronic notifications of changes to American's pension, welfare, health, and benefit plans through "Jetnet," American's internal employee website. But there is no indication as to when Ms. Nebesny–Fender elected to receive notice by e-mail, whether any such election continued beyond her termination from American, or whether Ms. Nebesny–Fender agreed to receive electronic notifications after her recall. The undated documents list Ms. Nebesny–Fender's status as "inactive," suggesting the documents were created at a time when Ms. Nebesny–Fender was not employed by American. The documents also provide Ms. Nebesny–Fender's e-mail address as donamaria@bellsouth.net. *See* A.R. 183–84.[4]

On January 1, 2005, American modified the prefunding plan a second time. This modification extended the period in which newly reinstated employees could re-enroll in the plan by returning refunded contributions from 60 days to 90 days. *See* A.R. 177–78 (summary of material modifica-

tions, effective January 1, 2005). At this time, Ms. Nebesny–Fender was still laid off from American.

American recalled and reinstated Ms. Nebesny–Fender as an employee at Ft. Lauderdale on June 25, 2005. Nearly 15 months later, on September 18, 2006, Ms. Nebesny–Fender contacted American's human resources/employee services department to inquire about the status of her participation in the prefunding plan. She was told that she had failed to return the refund of her prior contributions within 90 days of her reinstatement and thus was no longer a participant in the plan.

### B. Ms. Nebesny-Fender's First-Level Appeal

On October 3, 2006, Ms. Nebesny–Fender filed her first-level appeal of American's denial of her participation in the prefunding plan. In this appeal, Ms. Nebesny–Fender claimed she had never received any notice that she had to repay the refund of her previous prefunding contributions and actively opt back into the prefunding plan. She also claimed that, unlike other employees, she was never told at training about the changes to the prefunding plan. *See* A.R. 482–84.

American denied Ms. Nebesny–Fender's appeal on November 16, 2006. American based its denial on the fact that Ms. Nebesny–Fender did not repay the refund amount and had received notice of the amendments requiring repayment of refunds through (1) the language of the employee benefits guide available on the internal employee website, "Jetnet;" and (2) the information contained in the RIF packet distributed by managers on duty when employees were laid off. American further noted that Ms. Nebesny–Fender had been told in May of 2003 to contact her

---

Stipulation of Undisputed Facts [D.E. 46] at 2 ¶ 7, and I will do the same.

4. The only date found in these documents is a 2004 copyright notice. *See* A.R. 183.

manager on duty if she had not received the RIF packet. *See* A.R. 490–92. **Significantly, American did not support its first-level denial with any documents, affidavits, or other evidence, except for an e-mail confirming that Ms. Nebesny–Fender had cashed her refund check.**

### C. Ms. Nebesny-Fender's Second-Level Appeal

Even after it denied Ms. Nebesny–Fender's first-level appeal, American was still trying to figure out whether Ms. Nebesny–Fender had been given proper notice of the changes to the prefunding plan. In an e-mail dated January 17, 2007, Marixa Franco—an American manager at Ft. Lauderdale—asked other American executives if anything could be done for Ms. Nebesny–Fender and another similarly situated employee, Rosa Bisconti–Germani. Ms. Franco, though noting that the repayment requirement was set forth in the RIF packet and available on "Jetnet," acknowledged that American "locally . . . failed to sit and review any items for [the employees'] return to work." *See* A.R. 495.[5] Another American executive, Mike Waldron, responded to Ms. Franco that "[u]nfortunately, all matters related to prefunding are governed by ERISA laws which limit a lot of our flexibility in how we could possibly help these folks." *See* A.R. 496. American, however, did set up a conference call with Ms. Franco, Ms. Nebesny–Fender, and Ms. Bisconti–Germani in early February of 2007, and extended the time for both employees to file a second-level appeal.

On April 24, 2007, Ms. Nebesny–Fender filed her second-level appeal with the Pension Benefit Administration Committee (PBAC), the entity American uses for this level of administrative review. In this appeal, Ms. Nebesny–Fender again claimed that she had never received notice of the change in the prefunding plan terms. She disputed American's findings in its denial of her first-level appeal, asserting that she had not received the RIF packet and had not received any other information informing her of the change in program terms. She explained that she was "lost in the shuffle" given the "large turnover of personnel in [Ft.] Lauderdale," and maintained that some managers were "not familiar" with what rules applied to former TWA agents like herself who had been laid off. She also asserted (as Ms. Franco had noted earlier) that her training agent in Ft. Lauderdale had never advised her about what she had to do to get back into the prefunding plan after reinstatement. *See* A.R. 539–40.

The PBAC upheld the original denial of Ms. Nebesny–Fender's appeal on May 25, 2007. *See* A.R. 609–15.[6] In its letter, the PBAC reasoned that the RIF packet that was to be given to Ft. Lauderdale employees who had been terminated contained all relevant materials, including the changes to the prefunding plan. Because Ms. Nebesny–Fender was instructed to retrieve her RIF packet from her manager on duty

---

**5.** According to American's own information, as reflected in Ms. Franco's e-mail, Ms. Nebesny–Fender and Ms. Bisconti–Germani were similarly situated in all relevant respects. First, like Ms. Nebesny–Fender, Ms. Bisconti–Germani was laid off pursuant to a reduction in force (in November of 2002). Second, like Ms. Nebesny–Fender, Ms. Bisconti–Germani was sent, and cashed, a refund check (of $129.83) for her prefunding plan contributions (in March of 2003). Third, like Ms. Nebesny–Fender, Ms. Bisconti–Germani was recalled and reinstated as an American employee (in June of 2005). Fourth, like Ms. Nebesny–Fender, Ms. Bisconti–Germani failed to repay her refund within 90 days of reinstatement. *See* A.R. 489, 495.

**6.** One of the pages in the PBAC's denial letter (page 6) is apparently numbered out of sequence in the administrative record as A.R. 624.

(after she called to say she had not received it), and did not contact American again, the PBAC "assumed" that the manager on duty had provided her with the RIF packet. *See* A.R. 624 (numbered out of sequence). The PBAC also indicated that all of the needed information was available to Ms. Nebesny–Fender online, through "Jetnet," when she was an active employee prior to her layoff in April of 2003, and when she was reinstated in June of 2005. *See* A.R. 614. The PBAC specifically did not make any findings about what Ms. Nebesny–Fender was told or not told at training after her reinstatement: "The PBAC cannot comment on any information (either verbal or written) that may or may not have been provided to you (or any other agent) during return to work training. This training normally will address return to work procedures with respect to employment issues, such as FAA regulations, uniforms, badges, scheduling, etc., and is not designed to address benefit issues." *See* A.R. 614. Finally, the PBAC noted that Ms. Nebesny–Fender could have contacted human resources/employee services "with questions with respect to benefit issues." *See* A.R. 614. **As with the first-level denial letter, no documents, affidavits, or other evidence were attached to the PBAC's second-level denial letter, except for a copy of the RIF packet, the information available on "Jetnet," and a note of a telephone conversation on May 9, 2003, in which Ms. Nebesny–Fender was told to "get with her MOD [manager on duty] and get the RIF package."** *See* A.R. 616–35.

The PBAC informed Ms. Nebesny–Fender that she could enroll "anew" in the prefunding plan. But she would have to pay a $250 non-refundable re-enrollment fee and accumulate 10 more years of prefunding at the appropriate age-based rates. *See* A.R. 615.

### D. Ms. Nebesny–Fender's Requests for Reconsideration

Ms. Nebesny–Fender wrote to the PBAC on January 17, 2008. She wanted to know why American had granted the appeal of Ms. Bisconti–Germani and reinstated her to the prefunding plan, while at the same time denying her appeals. *See* A.R. 647. The PBAC responded about a month later, stating that it could not discuss Ms. Bisconti–Germani's appeal, and that the reasons for her own denial were set forth in the previous correspondence. The PBAC further stated that its decision was final, and that it "would be inequitable to other employees to reconsider your appeal." *See* A.R. 652.

Meanwhile, on February 6, 2008, Ms. Nebesny–Fender's counsel sent PBAC a letter requesting reconsideration of its denial. In this letter, counsel argued that, under ERISA, (1) American was required to provide Ms. Nebesny–Fender with notice of any material modification or change to a plan; (2) the requirement to return the refund of previous prefunding plan contributions within 60 or 90 days was a material modification; and (3) Ms. Nebesny–Fender was not provided with any notice of this modification. *See* A.R. 648–49. Ms. Nebesny–Fender submitted an affidavit with this letter for reconsideration, in which she attested that she "was never informed in writing or otherwise" that the prefunding plan had been amended to require a return of prefunding plan refunds within 90 days of being recalled, until well after 90 days of returning to employment on June 25, 2005. She also stated in the affidavit that she was "not in any manner directed or advised to look online for amendments" to the prefunding plan until well after 90 days of returning to employment. Finally, she stated that it was not until well after 90 days of reinstatement that she learned that the check for $126.55

was in fact a refund of her prefunding plan contributions. *See* A.R. 650–51.

The PBAC forwarded this letter to Randall White, American's associate general counsel. Mr. White, on April 28, 2008, denied the request for reconsideration. He explained that Ms. Nebesny–Fender had been "specifically advised" to contact her manager on duty to get the RIF packet, which "was consistent with how all furloughed employees obtained such packets," and that human resources "received no further contact from Ms. Nebesny–Fender about the packet." He also explained that the changes to the prefunding plan were available to Ms. Nebesny–Fender in the Employee Benefits Guide (EBG), which was sent to all employees, including those on leaves of absence, by first-class mail. He further explained that the modifications to the prefunding plan were available to Ms. Nebesny–Fender online through "Jetnet," and that benefits information was "always available" to her through human resources/employee services. Finally, he explained that the modifications to the prefunding plan were communicated through an SMM, but did not say how that SMM was sent to Ms. Nebesny–Fender or other employees. *See* A.R. 653–54. **As with American's earlier denials, Mr. White did not support the assertions in his letter with any documents, affidavits, or other evidence.**

Ms. Nebesny–Fender's counsel wrote to Mr. White again on June 9, 2008. In that letter, he challenged the factual assertions Mr. White had made, and submitted additional evidence to controvert those statements. First, with respect to the SMMs and the EBGs, counsel submitted the affidavits of 15 American employees—including Ms. Nebesny–Fender—who stated under oath that from 2002–2005 they never received the SMMs or the EBGs informing them of the changes to the prefunding plan, and offered to provide more evidence on these matters if necessary. *See* A.R. 657–89 (affidavits). Second, as to the instructions that Ms. Nebesny–Fender was given to contact her manager on duty to obtain the RIF packet, counsel referred to the additional affidavit by Ms. Nebesny–Fender stating that she did not have any manager on duty in May of 2003, and that the RIF packet did not, in any event, disclose the changes to the prefunding program. *See* A.R. 657–59. Third, as to the availability of "Jetnet" and human resources/employee services, counsel cited again to the additional affidavit of Ms. Nebesny–Fender, in which she stated (1) that she did not have access to "Jetnet" from the time of her medical leave in 2002 until June of 2005, when she was reinstated, (2) that she had not been told to check Jetnet for changes to benefits within 90 days of her reinstatement, and (3) that she had no reason to contact human resources/employee services because she did not know that there had been any changes to the prefunding program. *See* A.R. 657–59.

▬ American included the June 9, 2008, letter and the attached affidavits in the administrative record, but did not otherwise respond to the request for reconsideration. On September 16, 2008, Ms. Nebesny–Fender's counsel wrote again to Mr. White. In this letter, he indicated that, because American had not responded to the prior letter and affidavits within 60 days, the appeal was deemed to be denied and Ms. Nebesny–Fender would proceed accordingly. *See* A.R. 690.[7]

---

7. As a general matter, an administrative appeal under ERISA must be resolved by the administrator within 60 days unless the administrator requests additional time. *See* 29 C.F.R. § 2560.503–1(i)(1). If the administrator fails to adjudicate an appeal within the required period of time, the employee is deemed to have exhausted her administrative remedies and may proceed to file suit in federal court. *See* 29 C.F.R. § 2560.503–1(*l*); *Ponsetti v. GE Pension Plan*, 614 F.3d 684,

On November 14, 2008, Ms. Nebesny–Fender filed this suit.

### III. DISCUSSION

Federal question jurisdiction exists under 28 U.S.C. § 1331, as this case arises under ERISA, 29 U.S.C. §§ 1132(a) and (e). Personal jurisdiction is proper and/or has been waived, and venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of Florida.

### A. STANDARD OF REVIEW

■ In an ERISA case like this one, in which the benefits plan at issue confers on the administrator of the plan discretionary authority to determine eligibility for benefits, "a deferential standard of review is appropriate." *See Glenn,* 128 S.Ct. at 2348. After *Glenn,* the Eleventh Circuit requires a district court to engage in a sequential six-step analysis when applying the arbitrary and capricious standard. First, the court must apply a de novo standard to determine whether the administrator's decision was wrong (i.e., whether the court disagrees with the denial). If the decision was not wrong, the inquiry ends and the decision is affirmed. Second, if the administrator's decision was wrong under a de novo standard, then the court must determine whether the administrator was vested with discretion. If he was not, then the inquiry ends and the decision is reversed. Third, if the decision was wrong under a de novo standard and the administrator had discretion, then the court must determine whether reasonable grounds supported the decision under the deferential arbitrary and capricious standard. Fourth, if no reasonable grounds for the decision exist, then the court must reverse the administrator's decision. If there are reasonable grounds for the decision, then the court must determine if the administrator acted under a conflict of interest. Fifth, if there is no conflict, then the inquiry ends and the court affirms the decision. Sixth, if there is a conflict, the court must take the conflict into account as a factor in determining whether the administrator's decision was arbitrary and capricious, keeping in mind that the employee/beneficiary retains the burden of showing the decision was arbitrary and capricious. *See, e.g., Capone v. Aetna Life Ins.,* 592 F.3d 1189, 1196 (11th Cir.2010).

### B. AMERICAN'S DECISION WAS WRONG UNDER A DE NOVO STANDARD

■ ERISA requires a plan administrator to notify employees, participants,

691 n. 4 (7th Cir.2010); *Krauss v. Oxford Health Plans, Inc.,* 517 F.3d 614, 624 (2d Cir.2008).

American did not inform Ms. Nebesny–Fender that her June 9, 2008, request for reconsideration was untimely or prohibited under the terms of the plan. Nor did it tell her that the administrative record had previously closed. Under these circumstances, all of the affidavits attached to the June 9, 2008, letter submitted by Ms. Nebesny–Fender's counsel are properly considered part of the administrative record, even though American chose not to respond to the letter. First, as I noted in an earlier order, American itself included these materials as part of the administrative record. Second, as the Fifth Circuit has explained, "the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Estate of Bratton v. Nat'l Union Fire Ins.,* 215 F.3d 516, 521 (5th Cir.2000) (citations omitted). "Further, as a safeguard against possible abuse or mistake, the claimant's lawyer may add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it. If the claimant submits additional information to the administrator, and requests the administrator to reconsider its decision, that additional information should be treated as part of the administrative record." *Id.* at 521 n. 5 (citations omitted).

and beneficiaries of any material changes to benefits within 60 days through an SMM. *See* 29 U.S.C. §§ 1022(a), 1024(b)(1). The dispute here is about whether American provided notice to Ms. Nebesny–Fender about the modifications to the prefunding plan. I conclude, based on the administrative record, that American's denial of Ms. Nebesny–Fender's request to re-enroll in the prefunding program was wrong under a de novo standard of review.

American based its decision on the assumption that it had provided Ms. Nebesny–Fender with various types of notice concerning the modifications to the prefunding plan (e.g., the RIF packet, the SMM, the EBG, and the information available on the "Jetnet"). But at no time did American support this assumption with any evidence whatsoever (other than the note indicating that Ms. Nebesny–Fender had been advised to contact her manager on duty to obtain the RIF packet). The RIF packet and the SMM are in the record, but there is no evidence of mailing, delivery, or receipt. In contrast, Ms. Nebesny–Fender submitted her own affidavits and the affidavits of numerous other American employees to completely rebut American's assumption that there had been proper or adequate notice. Ms. Nebesny–Fender swore under oath that she did not know (until well after her reinstatement) that the check for $126.55 was a refund of her prefunding plan contributions, that she did not have a manager on duty to contact in May of 2003 and therefore never received the RIF packet, that she did not have access to the "Jetnet" system from the time of her leave of absence in 2002 until after she was recalled in June of 2005, that she did not know that she had to look in "Jetnet" for possible changes to the prefunding program, that she was not told about any changes at her training after reinstatement, that she had no reason to call human resources/employ-

ee services about any changes because she was unaware of them, and that she never received the EBGs or the SMMs detailing the modifications to the prefunding program. The other American employees stated in their affidavits that they had never received any EBGs or SMMs by mail from 2002–2005. All the record contains on American's side of the ledger are conclusory statements by American about what it believed took place regarding notice of the changes to the prefunding plan.

In my view, American never provided proper or timely notice to Ms. Nebesny–Fender or other employees about the changes to the prefunding plan. Thus, under a de novo standard, American's denial of Ms. Nebesny–Fender's request to re-enroll in the prefunding plan with credit was wrong.

### C. AMERICAN'S DECISION WAS ARBITRARY AND CAPRICIOUS

 An administrator's decision, if supported by a reasonable basis, is not arbitrary and capricious, even if there is evidence that would support a contrary decision. *See Jett*, 890 F.2d at 1140. *See also Bowman Transp. Sys. v. Ark–Best Freight Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (though narrow, the arbitrary and capricious standard requires articulation of a "rational connection between the facts found and the choice made") (internal quotation marks and citations omitted). On a factual issue, an administrator's finding must be supported by substantial evidence or it will be found to be arbitrary and capricious. *See, e.g., Schwalm v. Guardian Life Ins.*, 626 F.3d 299, 308 (6th Cir.2010); *Anderson v. Cytec Indus.*, 619 F.3d 505, 512 (5th Cir.2010); *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir.2010); *Medina v. Metro. Life Ins.*, 588 F.3d 41, 45 (1st Cir.2009); *Midgett v. Washington Group Int'l Long Term Disability Plan*,

561 F.3d 887, 897 (8th Cir.2009); *Jett,* 890 F.2d at 1141 (Johnson, J., concurring in part and dissenting in part) (citing cases).

 In the words of the Eleventh Circuit, "the substantial evidence standard is merely 'a recitation of the arbitrary and capricious standard to factual findings;' it is 'more than a scintilla and is such evidence as a reasonable person would accept as adequate to support a conclusion.'" *Majali v. U.S. Dep't of Labor,* 294 Fed. Appx. 562, 563 n. 1 (11th Cir.2008) (quoting Eleventh Circuit cases). An ERISA administrator cannot rely on unproven assumptions that are contradicted by the record, no matter how strongly it believes those assumptions to be true. *See, e.g., Smith v. N.M. Coal 401(K) Personal Sav. Plan,* 334 Fed.Appx. 150, 160 (10th Cir. 2009) ("We cannot explain why the Plans failed to provide this critical evidence, but having no actual proof that these funds were beyond their control prior to March 24, they must likewise be restored and made available to Ms. Smith pursuant to the Plan's terms."); *Giannone v. Metro. Life Ins.,* 311 F.Supp.2d 168, 178 (D.Mass. 2004) ("[O]ne would think that substantial evidence means actual evidence, not third-hand speculations about the possible cause of a claimant's disability.").

 The question, then, is whether American had substantial evidence to find that it provided notice of the changes in the prefunding plan to Ms. Nebesny–Fender and other employees through means "reasonably calculated to ensure actual receipt of the material." *See* 29 C.F.R. § 2520.104b–1(b)(1). I conclude that the answer is no. American's decision was arbitrary and capricious, because it was not supported by any evidence, and was contradicted by the affidavits of Ms. Nebesny–Fender and the other American employees, as well as by admissions or concessions made by American executives.

To explain, I examine each of the bases for American's decision below.

1. American "assumed" that Ms. Nebesny–Fender had obtained the RIF packet from her manager on duty in May of 2003 because she had been told to contact that manager and she never subsequently called human resources/employee services. Hand-delivery at an employee's worksite is an acceptable form of notice under ERISA, *see* 29 C.F.R. § 2520.104b–1(b)(1), but American's assumption about delivery at work was contradicted by Ms. Nebesny–Fender's second affidavit, in which Ms. Nebesny–Fender attested that she was not working in May of 2003, that she therefore did not have a manager on duty at the time, and that she did not receive a RIF packet from any manager. Putting aside the fact that Ms. Nebesny–Fender did not have a worksite in May of 2003—because she had been laid off—American did not produce any evidence (by affidavits, documents, or otherwise) that in 2003 RIF packets were distributed by hand at worksites by managers on duty, or that Ms. Nebesny–Fender even had a manager on duty in May of 2003, or that in some other way it provided the RIF package to Ms. Nebesny–Fender. If American had policy manuals or written standardized procedures with respect to the distribution of RIF packets, or any contemporaneous memoranda laying out the directive of distribution by managers on duty, those documents are nowhere to be found in the administrative record.

2. American relied on the undisputed fact that Ms. Nebesny–Fender cashed the refund check for $126.55. This reliance was misplaced for a number of reasons. First, the check (which, by the way, was not from American itself) did not state what it was for. Nor was it accompanied by any letter or attachment providing a legend or explanation. For all Ms. Nebes-

ny–Fender knew, the check could have a been for something other than a refund of her prefunding plan contributions. Indeed, Ms. Nebesny–Fender stated in one of her affidavits that she did not learn the reason for the check until well after she was reinstated. Second, the PBAC, by choosing not to comment on the matter, left in place Ms. Nebesny–Fender's sworn statement that she was not told of any changes during her training after reinstatement. Third, the e-mail written by Ms. Franco, the American manager at Ft. Lauderdale, confirms that reinstated employees like Ms. Nebesny–Fender were not told about changes to the prefunding plan at training. This is not, of course, dispositive, but it certainly dispels any contention that, despite the lack of written notice, Ms. Nebesny–Fender still found out about the reason for the check (and about modifications to the prefunding plan) through alternate sources.

■ 3. American said that Ms. Nebesny–Fender could have found the changes to the prefunding plan by accessing "Jetnet." As an initial matter, there is no evidence that Ms. Nebesny–Fender (and/or any other American employees) received a separate electronic or non-electronic communication about the amendments. If an employer wishes to use electronic means for notification, it must, among other things, provide notice "to each participant, beneficiary, or other individual in electronic or non-electronic form, at the time the document is furnished electronically, that apprises the individual of the significance of the document when it is not otherwise reasonably evident as transmitted." 29 C.F.R. § 2520.104b–1(c)(1)(iii). As explained in this order, there is no evidence that American did this, and the mere availability of a document on a company website is not enough under ERISA. *See, e.g., Gertjejansen v. Kemper Ins. Cos.,* 274 Fed.Appx. 569, 570 (9th Cir.2008) ("A plan administrator satis-

fies [ERISA] disclosure requirements [concerning modifications] by furnishing documents through electronic media as long as the administrator 'takes appropriate and necessary measures reasonably calculated to ensure that the system for furnishing documents . . . [r]esults in actual receipt of transmitted information.' 29 C.F.R. § 2520.104b–1(c)(1)(i). Lumbermens has submitted nothing on the record to suggest that the mere placement of an updated SPD on its intranet site could ensure that Gertjejansen would actually receive the transmitted information."); *Larsen v. Airtran Airways, Inc.,* No. 07–cv–442, 2009 WL 4827522, *9 (M.D.Fla. 2009) ("The fact that the SPD [summary plan description] may have been available for review does not excuse the breach [of having failed to provide notice].").

Moreover, the only document in the record that shows that Ms. Nebesny–Fender agreed at one point to receive certain communications by electronic means is undated, and Ms. Nebesny–Fender stated in one of her affidavits that she did not have access to "Jetnet" from the time of her medical leave in 2002 until her reinstatement in June of 2005. *See also* A.R. 599 (handwritten notation in file indicating that Ms. Nebesny–Fender called human resources/employee services on June 1, 2005, about how to change her "Jetnet" password). Ms. Nebesny–Fender, furthermore, had no reason to check "Jetnet" for changes to the prefunding plan given that, as she stated in the affidavit, no one told her about any changes or suggested that she go online to check for amendments or modifications. As the governing regulation states, "in no case is it acceptable to place copies of the material in a location frequented by participants." *See* 29 C.F.R. § 2520.104b–1(b)(1). It is unreasonable for a company like American to expect newly reinstated employees to go on a company website and check every page,

paragraph, line, and word of every ERISA plan to see if material changes have been made during their absence from work.

4. American stated that the changes to the prefunding plan were provided to Ms. Nebesny–Fender through the EBGs (which were purportedly sent through first-class mail) and the SMMs. At no time, however, did American provide any business records or other physical evidence of any mailings of the EBGs or SMMs to employees in general or Ms. Nebesny–Fender in particular (e.g., address labels, employee lists for each mailing, post-marked envelopes, signed receipts of certified mail), or submit any affidavits from employees or contractors about normal business practices concerning the mailings of documents required by ERISA. That failure on American's part is significant because Ms. Nebesny–Fender and a number of other American employees provided affidavits stating that from 2002–2005 they did not receive any EBGs or SMMs from American—and specifically did not receive any documents referencing the changes to the prefunding plan—by mail or otherwise. Given that American did not submit any evidence about mailings generally or specifically, and did not rebut these affidavits in any way, it could not rely on its unsupported claim concerning the mailings of the EBGs and the SMMs. *See, e.g.,* 29 C.F.R. § 2520.104b–1(b)(1) (ERISA administrator must use "measures reasonably calculated to ensure actual receipt"); *Custer v. Murphy Oil USA,* 503 F.3d 415, 420–21 (5th Cir.2007) (holding that, where employee submits evidence that ERISA document was not received by either himself or others, that evidence "can be used to establish that the notice was never mailed," and testimony of employer concerning regular business practice of mailing is still not enough to sustain summary judgment for administrator). Significantly, in cases where ERISA employees or participants

have provided evidence of non-receipt, the employer or administrator has prevailed only upon proof that mailings actually took place. *See, e.g., Williams v. Plumbers & Steamfitters Local 60,* 48 F.3d 923, 926 (5th Cir.1995) (compliance with 29 C.F.R. § 2520.104b–1(b)(1) was satisfied by affidavit in which plan administrator stated that he had "prepared and had mailed a letter to all plan participants notifying them of the amendment requirement and that a copy of the letter was attached to SPDs [summary plan descriptions] distributed to new participants"); *Brenner v. Johns Hopkins Univ.,* 88 Fed.Appx. 555, 559–60 (4th Cir.2004) (university showed with uncontradicted evidence that benefits statements were sent by first-class mail and additionally provided evidence that statements were sent through campus mail as well). Such proof is utterly absent here.

5. American concluded that Ms. Nebesny–Fender could have found out about the changes to the prefunding plan by contacting human resources/employee services. Yet, as Ms. Nebesny–Fender stated in one of her affidavits, she had no reason to call about the prefunding plan because she was not aware of any changes to the plan. In any event, I am aware of no authority that allows an employer to shrug off its ERISA notice obligations by demanding or expecting that employees will call the personnel department to find out about modifications to benefit plans.

In addition to what is set forth above, there is another indication that American acted arbitrarily and capriciously with respect to Ms. Nebesny–Fender. As explained earlier in footnote 5, an e-mail from American's manager in Ft. Lauderdale, Ms. Franco, indicated that Ms. Nebesny–Fender was similarly situated in all relevant respects to another American employee, Ms. Bisconti–Germani. *See* A.R. 489, 495. Yet it appears that American

granted Ms. Bisconti–Germani's appeal with respect to the prefunding plan, while at the same time denying Ms. Nebesny–Fender's appeal. The PBAC chose not to provide Ms. Nebesny–Fender with any details concerning Ms. Bisconti–Germani's case, *see* A.R. 652, and although American may have been perfectly within its rights to withhold such information given privacy concerns, the administrative record, as it stands, suggests that American treated two similarly situated employees differently with respect to their efforts to re-enroll in the prefunding plan. Such disparate treatment, bereft of any explanation, is arbitrary and capricious. *See Hess v. Reg–Ellen Mach. Tool Corp.*, 423 F.3d 653, 663 (7th Cir.2005) ("[E]vidence of inconsistent interpretations [is] a factor to be considered in determining whether a plan administrator's decision is arbitrary and capricious."). *Cf. Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 7 (D.C.Cir.2009) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.") (internal quotation marks and citation omitted); *Mahon v. U.S. Dep't of Agric.*, 485 F.3d 1247, 1260 (11th Cir.2007) ("[T]his court is convinced that the Agency acted arbitrarily and capriciously by treating similarly situated producers differently, and by ignoring evidence which supported ... Mahon's claims.").

## D. Ms. Nebesny–Fender Was Harmed by the Lack of Notice

When determining whether benefits should be reinstated due to a failure of the plan administrator to comply with notice requirements, a court considers (1) whether notice was sent in an acceptable manner, and (2) if it was not, whether the employee was harmed by the administrator's failure to notify her, *See Leyda v. AlliedSignal, Inc.*, 322 F.3d 199, 208–09 (2d Cir.2003); *Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 113 (1st Cir. 2002); *Welsh v. GTE Serv. Corp.*, 866 F.Supp. 1420, 1426 (N.D.Ga.1994), *aff'd*, 61 F.3d 32 (11th Cir.1995) (table).

The administrative record, on its own, shows that Ms. Nebesny–Fender faced substantial prejudice from American's failure to provide notice. The evidence in the administrative record shows that Ms. Nebesny–Fender never received a RIF packet, that management at the time of her layoff was unfamiliar with the status of former TWA employees (like Ms. Nebesny–Fender) who were laid off, and that American neither informed her of any changes in the prefunding plan nor told her to look at "Jetnet." *See* A.R. 539–40, 657–59. And, quickly after discovering that she was not enrolled in the prefunding plan, Ms. Nebesny–Fender filed a claim with American. *See* A.R. 531–35. In her claim, she asked American to inform her how much she needed to pay.

The administrative record also shows that Ms. Nebesny–Fender, through two affidavits, testified that she was unaware of the changes until after the 90–day period had elapsed. *See* AR 648–51, 655–89. This record shows that, when American informed her that she was no longer part of the plan for failing to refund the $126.55, Ms. Nebesny–Fender appealed. In her appeal, she attempted to write American a check for $126.55. *See* A.R. 539–40. Thus, every piece of evidence in the administrative record shows a person who, upon discovering that she was no longer enrolled in a benefit plan, frantically tried to re-enroll. The only reasonable conclusion is that, had she received notice, Ms. Nebesny–Fender would have returned the $126.55 within the requisite time frame.

The administrative record, moreover, shows that Ms. Nebesny–Fender suffered

a loss in benefits from her lack of notice. Ms. Nebesny–Fender told American that the plan was her "most important benefit." *See* A.R. 539. Because American denied Ms. Nebesny–Fender's claim, Ms. Nebesny–Fender lost her former credit and had to pay a higher monthly contribution.

The administrative record shows that the failure to receive notice prejudiced Ms. Nebesny–Fender, so I need not rely on evidence outside of the administrative record. Still, even if I relied on the evidence introduced at trial, the outcome would remain unchanged.

Specifically, I find that Ms. Nebesny–Fender never received notice of the prefunding plan amendments. I also find that she would have timely returned the $126.55 and re-enrolled in the plan if given the opportunity. Finally, I find that this lack of notice caused Ms. Nebesny–Fender harm.

The evidence and Ms. Nebesny–Fender's testimony, which I find to be truthful and credible, show that Ms. Nebesny–Fender never received the RIF packet, that she had no access to "Jetnet" from 2002 to June of 2005, and that she never received *any* e-mail from American about the changes. And Ms. Nebesny–Fender only got a 2002 RIF packet in 2005, after she was recalled and after the 90–day period had elapsed. Significantly, another employee—and not American—gave that 2002 RIF packet to Ms. Nebesny–Fender. Critically, Ms. Nebesny–Fender further testified that she would not have lost her benefits for $126.55.[8] I believe her, and thus conclude that Ms. Nebesny–Fender would have re-enrolled in the plan and would have returned the $126.55 if she had received notice. And, because the evidence shows that Ms. Nebesny–Fender lost her previous credit and previous contribution rate, Ms. Nebesny–Fender has suffered harm. Therefore, Ms. Nebesny–Fender has shown that American's failure to provide proper notice prejudiced her.

In contrast, the evidence presented by American is shoddy at best. Although Deborah Jameson of American testified that American sends SMMs to employees, American offered no mailing lists or testimony by anyone who actually mailed the SMMs. And the evidence presented showed that American used a printing service to make the labels used to mail the SMMs. Yet no one from the printing service testified. In addition, Ms. Jameson admitted that she did not know how American delivered RIF packets to people, like Ms. Nebesny–Fender, who were not at the airport at the time of their release. Ms. Jameson did testify that managers delivered RIF packets. But, again, American offered no testimony of any manager stating that he or she delivered the relevant RIF packets to employees. Ms. Jameson's admission that she did not know whether those individuals laid off had SMMs sent to them further weakens American's case. Similarly, the testimony that American posted the SMMs on "Jetnet" is legally insufficient, as I have explained above. *See, e.g., Gertjejansen,* 274 Fed.Appx. at 570. But, even if it were legally sufficient, American offered no evidence that Ms. Nebesny–Fender could have checked the SMM on "Jetnet." For instance, American's Patrick Koyle testified that he did not know if Ms. Nebesny–Fender could even access the SMMs on "Jetnet" while she was laid off. And he had no response when asked why American had no confir-

---

**8.** No evidence was presented as to why any rational person would lose significant benefits for $126.55. It just does not make sense that Ms. Nebesny–Fender would forgo significant benefits and decide to pay a higher monthly contribution for $126. I understand that, at times, individuals miss or forget deadlines. But I do not believe that Ms. Nebesny–Fender simply forgot or missed this deadline. I find instead that she never received proper notice.

mation e-mail proving that Ms. Nebesny–Fender received the SMMs through electronic means.

In fact, the only evidence offered by American linking notice to Ms. Nebesny–Fender came from the testimony of Heather Miletic. Ms. Miletic testified that American sent Ms. Nebesny–Fender an e-mail, with notice, in late July of 2005— about a month after American recalled Ms. Nebesny–Fender. Given the lack of any other evidence, I find it difficult to give much weight to this evidence. It specifically contradicts Ms. Nebesny–Fender's testimony, which I have found credible. Moreover, this notice was sent a month after American recalled Ms. Nebesny–Fender and months past the deadline set by 29 U.S.C. § 1024(b)(1). This further saps whatever weight the evidence merits.

With regard to a remedy, I understand that, even when a beneficiary lacked notice of an amendment, courts should not set aside the amendment. *See, e.g., Lettrich v. J.C. Penney Co.,* 213 F.3d 765, 771 (3d Cir.2000) ("[T]he general rule [is] that plan amendments are valid in spite of inadequate notice...."). But Ms. Nebesny–Fender does not seek to strike or set aside the amendments made by American to the prefunding plan; she simply asks that American retroactively re-enroll her in the prefunding plan. Ms. Nebesny–Fender's lack of notice prejudiced her, and courts have upheld beneficiary's rights to obtain their benefits in these situations. *See, e.g., id.* ("[P]articipants may recover the benefits under the plan before the amendment if they can demonstrate cognizable prejudice from the company's failure to fully comply with ERISA's disclosure requirements...."); *Veilleux v. Atochem N. Am.,* 929 F.2d 74, 76 (2d Cir.1991) ("Where violations of ERISA disclosure provisions work a 'substantive harm' on plaintiffs who are denied benefits under the improperly disclosed plan, courts may ... grant the benefits."). Thus, I believe that Ms. Nebesny–Fender should be allowed to re-enroll in the prefunding program, retroactive to June of 2005, if she repays the refund and pays any accumulated monthly contributions. *Cf. Branch v. G. Bernd Co.,* 955 F.2d 1574, 1581 (11th Cir.1992) (tolling period to elect COBRA benefits when beneficiary is unable to make an election because of incapacitation).

## IV. CONCLUSION

Based on the administrative record, American failed to provide proper notice of the modifications to the prefunding plan, and acted arbitrarily and capriciously in denying Ms. Nebesny–Fender's requests to be re-enrolled in the plan. Because she was harmed by the lack of notice, Ms. Nebesny–Fender is entitled to appropriate relief under ERISA. American shall therefore allow Ms. Nebesny–Fender to re-enroll in the prefunding plan, retroactive to June of 2005, as long as she repays the refund of her prefunding contributions within 14 days of this order, and pays any accumulated (and unpaid) monthly contributions (from June of 2005 to present) to date within 60 days of this order. A final judgment will be issued separately.[9]

---

9. Because American had numerous opportunities to put its own evidence about notice in the administrative record, this is one of those cases were a remand to the administrator is not appropriate. *See Taylor v. Broadspire Servicing, Inc.,* 314 Fed.Appx. 187, 192 (11th Cir.2008) (per curiam).